IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 29, 2010

## DAVID LYNN HARRISON v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Knox County**
**No. 90340     Bob R. McGee, Judge**

_____

**No. E2009-01961-CCA-R3-PC - Filed October 11, 2010**

_____

The Petitioner, David Lynn Harrison, appeals as of right from the Knox County Criminal Court's denial of his petition for post-conviction relief challenging his guilty plea convictions for attempted first degree murder, aggravated burglary, and reckless endangerment for which he received an effective sentence of 16 years. The Petitioner challenged the voluntariness of his guilty pleas and the performance of counsel. Following an evidentiary hearing, the post-conviction court denied relief. We remand the Petitioner's case because the trial court failed to enter findings of fact as to the Petitioner's contention that he did not voluntarily plead guilty. The trial court is instructed to issue findings of fact and conclusions of law on that issue. We affirm the judgment of the trial court in all other respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is
Affirmed in Part and Reversed in Part; Case Remanded.**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and NORMA MCGEE OGLE, J., joined.

Albert J. Newman, Jr., Knoxville, Tennessee, attorney for appellant, David Lynn Harrison.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Randall Eugene Nichols, District Attorney General; and Philip Morton, Assistant District Attorney General, attorneys for appellee, State of Tennessee.

## OPINION

We will provide the following factual summary as provided by the Petitioner at the post-conviction hearing to establish context for the Petitioner's issues on appeal. On April

28, 2006, the Petitioner called the police to complain about loud noise coming from the victim's house. The victim, Wesley Staley, and his family lived across the street from the Petitioner. The police arrived, spoke with the Staleys, and left. After the police left, the victim yelled at the Petitioner's daughter and her friend. The Petitioner then argued with the victim, and the argument escalated into a physical altercation in which the victim threatened to kill the Petitioner while holding a tire iron above the Petitioner's head. The victim's brother also joined in the altercation. The Petitioner ran to his car and grabbed a gun. When the victim and his brother saw the Petitioner's gun, they ran into the victim's house and closed the door. The Petitioner went to the victim's house, knocked the door open, and shot the victim three times. The Petitioner walked back to his house, and the victim's wife called the police.

At the guilty plea submission hearing, the Petitioner did not indicate that he was unhappy with trial counsel or that he wanted to go to trial. On the contrary, he answered all of the trial court's questions and admitted guilt. At the evidentiary hearing, the Petitioner stated that attorneys from the Public Defender's Office only visited him approximately 15 times in a 15-month period and that each meeting lasted approximately 15 minutes. In these meetings, the Petitioner "[r]epeatedly" told the attorneys what happened on the day that he shot the victim. However, the attorneys told him that he did not have a viable defense and only tried to establish a defense of diminished capacity. He stated that he was examined by Dr. Pamela Auble but that he never saw Dr. Auble's reports from his examination or heard about the results of the examination.

The Petitioner stated that he repeatedly told counsel that he wanted to go to trial. However, he eventually agreed to plead guilty because he was unhappy in jail and because counsel told him that prison was better than jail. The Petitioner also alluded to several family issues that influenced his decision to plead guilty. The Petitioner further stated that trial counsel told him that he would be convicted if he went to trial and that he would "spend the rest of [his] life in prison" because the court would likely impose consecutive sentences.

The Petitioner testified that counsel failed to interview witnesses and that counsel told him they would not interview Brett Staley, the victim's brother, because they were not allowed to conduct depositions in criminal court. The Petitioner conceded that counsel interviewed the Petitioner's wife, daughter, and his daughter's friend. The Petitioner stated that he did not view certain photographs of the crime scene because the District Attorney's Office withheld the photographs "that would prove that the Staleys weren't actually telling the truth about what happened." The Petitioner stated that lead counsel viewed these photographs but that lead counsel never showed the photographs to the Petitioner.

The Petitioner testified that lead counsel had a "prior relationship" with Twyla Tucker, an "aunt or close family friend" of the Staleys. The Petitioner admitted that he talked to lead counsel about this relationship and that he did not ask lead counsel to withdraw from the case even though he was aware of the relationship. However, the Petitioner admitted that lead counsel filed a motion to withdraw from the case because the Public Defender's Office "didn't have the manpower" to adequately represent him and other clients. The Petitioner further complained that lead counsel "wouldn't do nothing [he] asked him [to do]" and that counsel was not ready for trial. The Petitioner stated that had he believed that counsel was prepared for trial, he would have insisted on going to trial.

The Petitioner also noted that the trial judge, Judge Irvine, had a conflict of interest because "the judge had just come out of the prosecutor's office." He stated that when he discussed this conflict of interest with counsel, counsel told him that Judge Irvine "would be the best one suited to handle" his case.

On cross-examination, the Petitioner admitted that he was on bond for a theft charge in another case when he shot the victim and that the Public Defender's Office was representing him in that matter as well. Relative to the instant case, the Petitioner admitted that he met with his attorneys at least 15 times prior to pleading guilty. The Petitioner also admitted that the Staleys testified at the preliminary hearing and at two subsequent bond motion hearings. The Petitioner testified that the Staleys' testimony was inconsistent at each hearing and that he highlighted each inconsistency for counsel to review. However, lead counsel told him that it did not matter that the witnesses were not telling the truth at the hearings. Lead counsel also refused to call any witnesses to highlight these discrepancies at the hearings. The Petitioner testified that the crime scene photographs could have supported his theory of self-defense because the victim was still armed when he shot him. The Petitioner admitted that he told the trial court that he was satisfied with counsel's representation.

On redirect examination, the Petitioner stated that he told the trial court that he was satisfied because he "wanted to get away" from the jail. The Petitioner insisted that he was not lying to the trial court when he told the trial court that he was satisfied with counsel's representation. He also insisted that he was "forced, coerced, threatened, and intimidated" into accepting the plea agreement because he was told that he would "die in prison" if he did not accept the agreement.

Lead counsel testified that the Petitioner "was interviewed by some combination of the defense team 62 times" and that he attended "more than half of those meetings." He stated that the Petitioner had given him the same factual summary when discussing the case. Lead counsel testified that he interviewed the Petitioner's wife, the Petitioner's daughter, the

Petitioner's daughter's friend, and the neighbors who lived on each side of the Staley residence and that he discussed these interviews with the Petitioner. He stated that the Petitioner's wife disagreed with the Petitioner's chain of events and told him that the Petitioner went into the house before he retrieved his gun from the car.

Lead counsel testified that he was hesitant to introduce a theory of self-defense because the Staleys testified that they never left the street and did not come onto the Petitioner's property. Therefore, when the Petitioner went inside his house and then retrieved a gun from his car, the Staleys were no longer the aggressors in the situation. Moreover, the Petitioner chased the Staleys into their house and pushed his way into the house before shooting the victim.

Lead counsel stated that the Petitioner was examined by Dr. Auble because he thought he may be able to present an insanity defense but that Dr. Auble said that she would not support an insanity defense. Dr. Auble told lead counsel that the Petitioner had a borderline personality disorder and that he suffered from depression. Based on Dr. Auble's recommendations, lead counsel attempted to pursue a theory of diminished capacity. Lead counsel stated that he discussed these issues with the Petitioner and that he believed that the Petitioner understood the situation "[a]s well as [the Petitioner could] understand it."

Lead counsel stated that they offered to accept an effective sentence of 12 years but that the State's attorney rejected this offer. Lead counsel admitted that the Petitioner repeatedly told the defense team that he wanted to go to trial and that the Petitioner believed that he could assert a theory of self-defense because the victim was the initial aggressor. Lead counsel stated that the defense team told the Petitioner that he would be convicted because the jury would not be sympathetic to his version of events. Lead counsel believed that the Petitioner eventually voluntarily decided to plead guilty.

On cross-examination, lead counsel stated that he was licensed in 1980 and that since that time, he had tried many cases and represented many defendants who had been charged with criminal offenses. He stated that the Petitioner was interviewed by the defense team two days after the Public Defender's Office was appointed to represent him but that he did not personally interview the Petitioner until after his case was bound over to the grand jury. Lead counsel stated that during that time, an attorney was interviewing the Petitioner and preparing a defense. He stated that at that time, he was only representing defendants who were charged with first degree murder but that he believed the facts of the Petitioner's case were complicated and that he should be involved in the Petitioner's defense. He stated that the Petitioner was represented by an entire defense team and that several lawyers and members from the social service department were working on the Petitioner's case. He stated that the team received permission from Twyla Tucker, whose husband owned the

-4-

Staley residence, to videotape the crime scene and that members of his office created a virtual crime scene for use at trial. He stated that the defense team attempted to interview the Staleys but that the Staleys did not want to speak with them. He believed that they did not necessarily need to interview the Staleys because they had testified three times at various hearings. He admitted that the Petitioner was correct in asserting that there were inconsistencies in the Staleys' version of events, but he said the inconsistencies were not significant enough to "discredit the critical parts of their testimony." He also stated that the Petitioner was given a chance to view the crime scene photographs.

In denying the petition for post-conviction relief, the trial court stated that the Petitioner did not have a viable self-defense argument given the facts of the case and that the Public Defender's Office "explored, investigated, [and] did their best to communicate with the client." The trial court further stated, "there's no way this [c]ourt could come anywhere near finding ineffective assistance of counsel." The trial court also entered a written order denying the petition for post-conviction relief; however, this order does not contain any findings of fact or conclusions of law and merely states that the petition for post-conviction relief was denied.

## ANALYSIS

The Petitioner contends that he could not voluntarily plead guilty because he suffered from depression, had a borderline personality disorder, "suffer[ed] some diminished capacity" and was under distress because of the improper jail conditions and his family's medical problems. The Petitioner also appears to contend in his brief that counsel should have noted his diminished capacity at the guilty plea submission hearing because counsel was aware of his condition. The Petitioner further contends that counsel was ineffective because counsel was not prepared for trial and refused to present his theory of self-defense. The State responds that the Petitioner has failed to prove his allegations by clear and convincing evidence.

We first note that pursuant to Tennessee Code Annotated section 40-30-111(b), the trial court is required to enter a final order that sets forth "all grounds presented" and states "the findings of fact and conclusions of law with regard to each ground." Ordinarily, the trial court's failure to enter findings of fact and conclusions of law in its written order would be considered harmless error if the trial court rendered extensive findings in its oral pronouncement of the denial of post-conviction relief. See State v. Higgins, 729 S.W.2d 288, 290-91 (Tenn. Crim. App. 1987). However, in this case, the trial court failed to enter any findings on the record, written or oral, as to whether the Petitioner voluntarily pled guilty despite the Petitioner's assertions that he suffered from a mental impairment. The trial court also did not enter any findings on the record as to whether counsel was aware and should

have made the trial court aware that the Petitioner was unable to voluntarily plead guilty because of his mental impairment.

We note the State's assertion that the trial court orally entered findings on this issue when the trial court stated that "there's no way this [c]ourt could come anywhere near finding ineffective assistance of counsel." However, when reviewing the trial court's oral findings, it is clear that the trial court was discussing counsel's alleged ineffectiveness relative to the Petitioner's decision to plead guilty and not the Petitioner's alleged mental incapacity and inability to voluntarily and knowingly plead guilty. Accordingly, we remand the Petitioner's case for the trial court to enter written findings of fact and conclusions of law on those specific issues. See Michael Branham v. State, No. E2008-00404-CCA-R3-CD, 2009 WL 160920 (Tenn. Crim. App. Jan. 23, 2009); Joseph Franklin Clark v. State, No. E2006-01171-CCA-R3-PC, 2006 WL 3813627 (Tenn. Crim. App. Dec. 28, 2006). The Petitioner may then appeal the trial court's revised written order. However, we will analyze and consider the Petitioner's contention that he pled guilty because trial counsel was not prepared for trial.

The burden in a post-conviction proceeding is on the petitioner to prove the factual allegation to support his grounds for relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); See Dellinger v. State, 279 S.W.3d 282, 293-94 (Tenn. 2009). If the petitioner proves his grounds by clear and convincing evidence, the trial court must then determine whether trial counsel was ineffective according to Strickland v. Washington, 466 U.S. 668, 687 (1984). Dellinger, 279 S.W.3d at 293-94. On appeal, we are bound by the trial court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001). Because they relate to mixed questions of law and fact, we review the trial court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. Id. at 457.

Under the Sixth Amendment to the United States Constitution, when a claim of ineffective assistance of counsel is made, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland v. Washington, 466 U.S. 668, 687 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72 (1993). Failure to satisfy either prong results in the denial of relief. Strickland, 466 U.S. at 697. In other words, a showing that counsel's performance falls below a reasonable standard is not enough; rather, the petitioner must also show that "there is a reasonable probability" that but for the substandard performance, "the result of the proceeding would have been different." Id. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. The Strickland standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d

417, 419 n.2 (Tenn. 1989). In the context of a guilty plea as in this case, the effective assistance of counsel is relevant only to the extent that it affects the voluntariness of the plea. Therefore, to satisfy the second prong of Strickland, the petitioner must show that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Hill v. Lockhart, 474 U.S. 52, 59 (1985); see also Walton v. State, 966 S.W.2d 54, 55 (Tenn. Crim. App. 1997).

Relative to the Petitioner's contention that trial counsel was not prepared for trial, we believe the record supports the post-conviction court's finding that trial counsel was prepared and had performed an adequate investigation. The record reflects that lead counsel and his defense team interviewed several witnesses in preparation for trial, photographed the crime scene, and generally investigated the Petitioner's case. To the extent that the Petitioner is arguing that lead counsel did not adequately investigate witnesses, we believe that this claim is meritless. This court has long held that "[w]hen a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). The Petitioner offered no witnesses who should have been discovered by trial counsel. We cannot speculate as to what an investigation may have revealed regarding the evidence against the Petitioner. See id.

Relative to the Petitioner's contention that he pled guilty because counsel refused to assert a theory of self-defense at trial, we agree that the defense team did not believe that they could successfully maintain a theory of self-defense at trial. We also note that the facts as presented by the Petitioner, by the State, and by lead counsel, do not support a theory of self-defense when the Petitioner admitted that he chased the victim into the victim's house and knocked the door open before shooting the victim in the face three times. See Tenn. Code Ann. § 39-11-611 ("The person [must] reasonably believe[] the force is immediately necessary to protect against the other's use or attempted use of unlawful force."). Thus, we believe that the Petitioner was well-informed and received adequate advice before he made his ultimate decision to plead guilty. Accordingly, we conclude that the trial court did not err in finding that the Petitioner failed to establish that counsel was ineffective.

CONCLUSION

In consideration of the foregoing and the record as a whole, the judgment of the post-conviction court is affirmed in part and reversed in part. We remand this case to the trial

court, and the trial court is instructed to enter findings of fact and conclusions of law on the Petitioner's remaining issues.

_____

D. KELLY THOMAS, JR., JUDGE